IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 22, 2025 Session

## STATE OF TENNESSEE v. JEREMY ALLEN STEPHENS

**Appeal from the Circuit Court for Fentress County**
**No. 2020-CR-81      Zachary R. Walden, Judge**

---

### No. M2024-00133-CCA-R3-CD

---

In 2023, the Defendant, Jeremy Allen Stephens, entered a guilty plea to two counts of aggravated child abuse.  Subsequently, the Defendant filed a motion to withdraw his plea, which the trial court denied.  At the subsequent sentencing hearing, the trial court imposed an effective sentence of fifty years.  On appeal, the Defendant contends that his motion to withdraw his guilty plea should have been granted and that the trial court erred when it imposed consecutive sentences.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Leif Ericson Jeffers, District Public Defender - Appellate Division; Jessica F. Butler, Assistant District Public Defender, Franklin, Tennessee (on appeal); Gordon A. Byars, Cookeville, Tennessee (at trial), for the appellant, Jeremy Allen Stephens.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Jared R. Effler, District Attorney General; and Philip A. Kazee and Apryl Bradshaw, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Background

This case arises from the Defendant physically abusing the eight-month-old victim. As a result of the abuse, the victim sustained detached retinas in both eyes and two brain

bleeds. For this conduct, a Fentress County grand jury indicted the Defendant and the victim's mother for two counts of aggravated child abuse.

## A. Trial and Guilty Plea

The Defendant's case was severed from his co-defendant's case, and it proceeded to trial. After a lengthy voir dire and three days of trial, during which fifteen of the State's witnesses testified, the Defendant elected to plead guilty to both charges.

The following is a summary of the evidence presented at the Defendant's trial. The victim's father, Garrett Jenkins, testified that he and the victim's mother separated when the victim, their daughter, was five months old. The victim's mother began dating the Defendant a few weeks later, which led to Mr. Jenkins's divorce from the victim's mother. Mr. Jenkins was the primary residential parent but traded custody of the victim with her mother every other day. In July of 2020, the victim was unwell with an ear infection. The victim's mother cared for the victim beginning on July 10 and, that day, Mr. Jenkins learned from a third party that victim had been found "non-responsive" and had been transported to a hospital in Knoxville. Mr. Jenkins went to the hospital and learned that the victim was in surgery. Doctors reported to Mr. Jenkins that the victim had suffered two brain bleeds and the doctors suspected physical abuse. When Mr. Jenkins saw the victim, she was covered in bruises and had burn marks on her torso. Mr. Jenkins filed a civil suit to terminate the victim's mother's parental rights.

Hunter Fowler testified that he and his wife often babysat the victim and cared for her on the morning of July 9, 2020. He recalled that she seemed well that day and did not have bruises or burns on her body. Micaela Warden, the victim's grandmother, testified that the Defendant and the victim's mother were living together in July of 2020. Ms. Warden assumed care of the victim on the afternoon of July 9, 2020, following which she took the victim to the Defendant, who planned to babysit the victim until the victim's mother returned from work. Later on July 9, 2020, the victim's mother texted Ms. Warden, saying that the victim had fallen off the bed onto a concrete floor. She reported that the victim had hit her face but was fine. Ms. Warden saw the victim the next day, on July 10, 2020, and she noticed the bruise on the victim's face. She stated that the victim seemed fine. The victim was left in the Defendant's care at that point while Ms. Warden and the victim's mother went to their jobs. Later on July 10, 2020, Ms. Warden learned of the victim's hospitalization and went to see her. The victim was a different baby by then, stiff and lifeless.

Deputy Denton Jones of the Fentress County Sheriff's Department responded to the victim's residence on July 10, 2020. He transported the victim to a local doctor's office. The victim was moaning, seizing, and short of breath. Jamie Beaty, a paramedic in Fentress

County was off duty on July 10 but responded to the victim's residence. The victim's face was blue, and she had marks on her neck. The victim had burn marks on her torso and was lifeless. The victim suffered a seizure while Mr. Beaty attempted to treat her. Mr. Beaty asked the victim's mother about the victim's injuries. Her mother reported that the victim had fallen off the bed the day before but seemed fine. The victim's mother stated she had not noticed the bruise on the victim's face until the morning of July 10. Thereafter, the victim was flown by helicopter to the closest hospital.

Tennessee Bureau of Investigation ("TBI") agents interviewed the Defendant and the victim's mother. The Defendant confessed to injuring the victim. Dr. Mary Palmer examined the victim at the hospital on July 10, 2020, and she concluded that the victim had sustained non-accidental trauma. The victim sustained a life-threatening brain bleed caused by violent physical impact, and tears to both her retinas, also caused by a violent motion consistent with shaking. The victim's body was covered in bruises, including on her face. The victim had "fresh" burn marks on her body. The damage to the victim's eyes was likely permanent. A report detailing text messages between the Defendant and the victim's mother was introduced and defense counsel objected, stating that they had not been available prior to trial but that, if the jury read them, defense counsel's theory of defense would be completely nullified. At this point, the State offered an open plea, which the Defendant accepted, with the sentence be determined by the trial court. The trial court held a guilty plea hearing, at which it inquired of the Defendant his understanding of his sentencing exposure and his choice to plead guilty. After a lengthy discussion with counsel, the Defendant indicated that he understood the implications of his decision and wished to enter an open plea. The State relied on the evidence presented at trial as the basis for the plea and the trial court accepted the plea.

## B. Motion to Withdraw Guilty Plea

Approximately one month later, the Defendant filed a *pro se* motion to set aside his plea. Substitute counsel was appointed, and the trial court held a hearing on the Defendant's motion. TBI Agent Sanders testified that he had obtained the Defendant's and the victim's mother's cell phones and, with their consent, extracted their data which he stored in an electronic file. Agent Sanders provided the electronic file to the State and to defense counsel prior to trial. On cross-examination, Agent Sanders testified that there was no way for him to manipulate the data that was extracted from the phones and that he provided the entirety of the data to both parties.

Emily Wright served as counsel for the victim's mother and testified that she provided a hard drive to Agent Sanders for him to transfer the extracted data from the phones. She stated that she reviewed the text messages extracted from the phones and believed that counsel for the Defendant received the same data extraction report.

3

The trial court heard arguments and stated that it would rule on the Defendant's motion to withdraw his plea, pursuant to the factors set out in *State v. Phelps*, 329 S.W.3d 436 (Tenn 2010). The court noted that a plea may be withdrawn "for any fair and just reason if it's before sentencing." Concerning the *Phelps* factors, the court found that the relatively short length of time between the entry of the guilty plea and the filing of the motion to withdraw the plea; the grounds for seeking to withdraw the guilty plea; the fact that the Defendant had asserted and maintained his innocence until he decided to plead guilty; and the Defendant's the lack of experience with the criminal justice system; weighed slightly in favor of the Defendant and "barely justify a fair and just reason to allow withdrawal of the plea."

The trial court stated that "it gave defense counsel and co-counsel as much time as they needed to speak with the Defendant" and that counsel advised the Defendant very thoroughly concerning the ramifications of an open plea. The court found that the Defendant acknowledged "that he understood the sentencing ranges, concurrent versus consecutive sentencing," and "what it meant to enter a blind plea or an open plea." The court noted that the Defendant had filed a motion for a change of venue, that there had been extensive local press coverage, and that "in lieu of a change of venue," the court ordered "jury questionnaires so every juror on jury duty filled out a questionnaire." The court found that it was after the State had presented almost the entirety of its case in chief when the Defendant announced that he wanted to plead guilty. The court stated that there had been "three days of a very emotional trial" in which fifteen witnesses, including "two expert witnesses from East Tennessee" had testified. The court found that "it will be very, very difficult to get those expert witnesses again in a timely manner[.]" The court determined that the prosecution would be "prejudiced should the plea be withdrawn" and that "this factor overcomes the other factors and denied the motion to withdraw the guilty plea."

### C. Sentencing

At the Defendant's sentencing hearing, Agent Sanders testified that he extracted the data from the Defendant's and the victim's mother's cell phones. A text exchange between them on July 8, 2020, started with the Defendant telling the victim's mother that she needed to be "popping [the victim] in her mouth" when she cried. The Defendant said, "If you don't, I will." The Defendant stated his intention to "break" the victim of crying and that he would "light[] her ass on fire every time she cries for no reason."

The victim's father, Garrett Jenkins, testified that his daughter did not have any health issues prior to July 9, 2020. Following the abuse, the victim was deemed to be legally blind due to her retinas being detached. Due to the victim's brain bleed, half her skull was removed to make room for the swelling, and, after getting an infection, had her

skull replaced with a synthetic material. The victim had undergone five specialty procedures, and she would have to undergo many more throughout her life, including eye surgeries. Mr. Jenkins described the emotional and physical trauma his family had suffered due to the Defendant's actions.

The Defendant testified that he had not committed the crimes but had pleaded guilty to protect the victim's mother. Several witnesses testified to the Defendant's calm demeanor and that he was a good father. At the conclusion of the hearing, the trial court made the following statements:

> Before I begin pronouncing the sentence, I am somewhat grateful that I am not here pronouncing sentence on a homicide case. . . . .

> These cases are hard. I feel like I say this way too often, how hard it is when something terrible happens to a child at the hands of someone that people trusted. I really wish that this Courtroom offered closure for people, it doesn't. . . . .

> Instead, what we are here to do is to sentence [the Defendant] on two counts of aggravated child abuse which are Class A felonies. First of all, I note that the [D]efendant by -- and both parties agree to this, is a range one offender based on his lack of criminal history. For these particular offenses, we look at range one which is 15 to 25 years. Those would be served at 100 percent under this particular criminal statute without parole but with the possibility for good behavior credits and other credits through the Tennessee Department of Corrections to reduce that by no more than 15 percent.

> . . . .

> The findings on consecutive sentencing. . . . . When I see these terrible things happen to children which, as I said, I see all too often, I think a human response that I have is I try to figure out why, not necessarily a justification or an excuse, but some reason or explanation as to how this happened. Sometimes people are intoxicated. Sometimes when you see child abuse, it's - you know, you see a frazzled parent that's not slept for 48 hours and they snap. There's not that obvious explanation here, except in these text messages, and I want to make some specific credibility findings about these text messages while I'm at it because I heard from Agent Sanders not only today, but I heard from him at our motion hearing last time regarding the motion to withdraw a guilty plea as to how exactly he obtained these text messages from the [D]efendant's phone, and based on his explanation, I do

5

give significant weight to his testimony, that these text messages came from [the Defendant's] phone. And I do not credit [the Defendant's] testimony when he says that he doesn't remember sending anything like that, and he doesn't think he'd talk that way. [The Defendant] stated, you need to start popping her in the mouth when she cries. That tells me that before it ever happened, he was thinking about it, an eight-[m]onth old, []. This isn't a 12-year old smarting back to their mama, this is an eight-month old who was crying as [] eight-month olds tend to do. . . . . That's where we get into that additional *Wilkerson* factor that this is necessary in order to protect the public from further criminal acts, because the [D]efendant would intend to do another child the same way. He just really doesn't see what's wrong. I don't know what's going on in his mind to not see what's wrong, to sit here and claim to be the hero of the situation when he was the one that said, we need to pop her in the mouth, we need to hit her, an eight-month old. . . . . The intention was that the child, at least preliminary, would be exchanged, each parent would have her a week at a time, and [the Defendant] would have been part of [the victim's] life when she was with her mother for the week at a time. I'll break [the victim] from . . . crying, when we do a week at a time. I'll start lighting her ass on fire and every time she cries for no reason, I'll do it again (reading). I agree that I don't think there's any evidence that [the Defendant] is an angry person. This wasn't done out of a fit of rage, this is just what [the Defendant] believed was appropriate on how to treat a child.

        . . . .

        So, when I'm looking at these *Wilkerson* factors, I do find that the [D]efendant is a dangerous offender because for multiple days he abused a child to the point that she lost her eyesight and portions of her head, but beyond that, I also find that the public has to be protected from further criminal acts of the [D]efendant because he said this is how he would treat his own child, that he would hit an eight-month old of his own. This kid wasn't his. He'd do it to another kid that wasn't his. Especially because what I have seen throughout my time with [the Defendant], both in trial, at our mini motion hearings and here today, is just a total utter lack of remorse and lack of empathy and a lack of honesty. I note that the character letters and the character testimony espoused the virtues of [the Defendant], and I'm not gonna refute anyone's personal experience with him, I don't think anybody was being dishonest about their experience, but the most critical moment -- has nothing to do with guilt or innocence, trial, admissibility at Court – the most critical moment for someone to be honest would be when that baby's life was hanging in the balance when that helicopter was flying

6

to the hospital. Healthcare providers need to know in that moment what happened because they -- they only know what they're told, so they can make the best possible, potentially lifesaving decisions. And whichever version of [the Defendant's] testimony in this Court which all are totally inconsistent with each other, what's certainly not true is that the baby fell off a bed and hit her head, and that's what he told healthcare providers, and that's not true. He was undoubtedly dishonest. Whatever his reason, whether it was to protect himself or to protect the co-defendant in this case, if there's ever a time to stand up and be honest, it was when it could save the life of the baby, because I don't want to hear what a hero he was for calling 911. Again, barely saved him from a homicide charge is all that did.

He tells the TBI he didn't do it. He tells the TBI he did do it. He tells the TBI she hit her head, then he tells the TBI he hit her. He just kind of makes up whatever caused the burn marks. Then he stands before this Court and says he's guilty, and then he stands before this Court and says he's not guilty. And in the many, many, many versions that [the Defendant] has tried to sell us on what happened on the events of that day, we know we've not heard the truth. Because even if you believe his most recent one today which I don't, I don't credit his testimony at all, because he testified to things that were contrary to what I observed on the record with my own eyes as to how Mr. Byars advised him – even if you believe his version today, he still hasn't said what happened. I started off by talking about how this family is not gonna get closure in this Courtroom today, and they won't. There's nothing I can do to give that, but what might have given them something is if they knew what really happened, because they still don't know to this day. They're likely never going to know what really happened because [the Defendant] has continuously been dishonest throughout the entire process including when a life hung in the balance. That lack of remorse, that lack of empathy. . . . . This isn't a child abuse case, this is a child torture case, so the Court will be imposing aggregate sentences in this case.

I've considered the evidence presented by both parties at the sentencing hearing. We have incorporated the trial testimony and exhibits at a previous hearing, and I've heard that as well. . . . .

Additionally, I credit the testimony of the expert witnesses. The expert witness testimonies make it clear that [the Defendant's] various versions of events just don't add up. Whatever caused the baby to start having seizures or stop breathing had to have occurred very close in time that 911 was called. It couldn't have been that he was asleep for a couple hours

and woke up and that's what happened. That testimony weighs heavily in my mind as well.

. . . .

This crime is among the most serious types of offenses that we see in this Courtroom. Even in the class of Class A felony child abuse, this case is significant in its seriousness. We also have to consider fair and consistent treatment of defendants. Punishment should provide an effective general deterrent to those likely to violate the criminal laws of this State. . . . . I have spent a considerable amount of time thinking about this case over the last several months because we spent a lot of time in trial here together. The trial ended in somewhat of an unusual way, so that's also very memorable, and we've had numerous motion hearings, so this is -- this is a sentence that I've given great thought to. It's not something that comes out of me getting a little bit frustrated when I hear the [D]efendant testify falsely in front of me. This is something that I've really been considering since considering at least the facts and circumstances and given a lot of thought to it, as well as that I still have considered the evidence presented before me today as well. And it's not something I do lightly, but I do find that as to both counts [] I'm going to sentence [the Defendant] to 25 years and impose that sentence consecutively. That is an effective 50-year sentence in the Department of Corrections that will be served at 100 percent, day for day.

It is from these judgments that the Defendant appeals.

## II. Analysis
## A. Plea Withdrawal

On appeal, the Defendant argues that the trial court erred when it denied his motion to withdraw his plea because the *Phelps* factors support withdrawal. The State responds that the trial court properly determined that the "prejudice to the State" *Phelps* factor outweighed the other *Phelps* factors "to the extent that those factors can justify a fair and just reason to permit the withdrawal of the plea." We agree with the State.

A defendant's right to withdraw a guilty plea is governed by Tennessee Rule of Criminal Procedure 32(f):

(1) Before sentence is imposed, the court may grant a motion to withdraw a guilty plea for any fair and just reason.

(2) After sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice.

A defendant who has entered a guilty plea does not have a right to unilaterally withdraw the plea. *Phelps*, 329 S.W.3d at 444. A trial court's decision regarding a defendant's motion to withdraw a plea is reviewed for an abuse of discretion. *Id.* at 443 (citing *State v. Crowe*, 168 S.W.3d 731, 740 (Tenn. 2005)). "An abuse of discretion exists if the record lacks substantial evidence to support the trial court's conclusion." *Crowe*, 168 S.W.3d at 740 (citing *Goosby v. State*, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995)). A trial court also abuses its discretion "when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, . . . applies reasoning that causes an injustice to the complaining party[, or] . . . fail[s] to consider the relevant factors provided by higher courts as guidance for determining an issue." *Phelps*, 329 S.W.3d at 443 (internal citations omitted).

The Tennessee Supreme Court has concluded that trial courts should use "the federal courts' non-exclusive multi-factor approach" in determining whether to permit a defendant to withdraw a plea. *Id.* at 447. Those factors ("*Phelps* factors") include:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; (7) potential prejudice to the government if the motion to withdraw is granted.

*Id.* at 446 (quoting *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008)). "[N]o single factor is dispositive," and "the relevance of each factor varies according to the circumstances surrounding both the plea and the motion to withdraw." *Id.* (citing *Haygood*, 549 F.3d at 1052). The list of factors is not exclusive, and "a trial court need not consider the seventh factor unless and until the defendant establishes a fair and just reason for permitting withdrawal." *Id.* at 446-47 (citing *United States v. Ellis*, 470 F.3d 275, 286 (6th Cir. 2006)). A defendant bears the burden of establishing grounds for withdrawing his or her plea. *Id.* at 444.

"[T]he purpose of the 'any fair and just reason' standard 'is to allow a hastily entered plea made with unsure heart and confused mind to be undone.'" *Phelps*, 329 S.W.3d at 448 (quoting *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991)).

9

This standard reflects that "[b]efore sentencing, the inconvenience to court and prosecution resulting from a change of plea is ordinarily slight as compared with the public interest in protecting the right of the accused to trial by jury." *Crowe*, 168 S.W.3d at 741 (quoting *Kadwell v. United States*, 315 F.2d 667, 670 (9th Cir. 1963)). Thus, where the balance of the factors weighs in the defendant's favor, the trial court should permit a defendant to withdraw a plea "even if the defendant's reasons could be characterized as a 'change of heart.'" *Phelps*, 329 S.W.3d at 448. "[T]he trial judge should always exercise his discretion with caution in refusing to set aside a plea of guilty, to the end that one accused of crime may have a fair and impartial trial." *Id.* at 443 (quoting *Henning v. State*, 201 S.W.2d 669, 671 (Tenn. 1947)). However, "a defendant should not be allowed to pervert this process into a tactical tool for purposes of delay or other improper purpose." *Id.* at 448.

In this case, the trial court engaged in the relevant analysis, applied and weighed the *Phelps* factors to the evidence presented and determined that the Defendant should not be allowed to withdraw his plea. Our review reveals no abuse of discretion by the trial court.

The trial court found that the first *Phelps* factor—the amount of time that elapsed between the plea and the motion to withdraw it— weighed slightly in favor of granting the motion because, although the elapsed period until the Defendant filed his *pro se* motion was thirty-five days, Counsel represented to the trial court that the Defendant indicated his wishes to withdraw very soon after the plea was entered. The trial court determined that the second factor, the presence or absence of a valid reason for the delay in filing the motion, weighed in favor of the Defendant because, following the entry of the guilty plea, no other proceedings had been held at which the Defendant could make his motion to withdraw. The third factor – the Defendant's assertion or maintaining of innocence – weighed slightly in favor of the Defendant because he had made prior statements of innocence.

The trial court then considered the fourth, fifth, and sixth factors – the circumstances of the entry of the Defendant's plea, the Defendant's nature and background, and the Defendant's degree of experience with the justice system. The trial court noted that the Defendant did not have a criminal background and so was relatively inexperienced with criminal court procedures. For those reasons, the trial court gave the Defendant's counsel considerable time to address with the Defendant his decision to plead guilty. The trial court provided a "very thorough" explanation of the plea in open court and a lengthy plea colloquy. A lengthy explanation of the waiver of rights provided additional time for explanation. For these reasons, the trial court found that these *Phelps* factors were neutral, given the Defendant's inexperience versus the lengthy process for explaining the plea and deciding to enter it.

10

The seventh factor addresses the potential prejudice to the government if the plea is withdrawn. The trial court noted that the Defendant elected to plead guilty essentially at the end of the State's proof, after fifteen witnesses had testified, including two expert witnesses at considerable financial cost to the State. The trial court noted the lengthy voir dire process and the "great pains" taken to impanel the jury, with many in the jury pool having to be excused because of prejudice. The trial court determined that this factor, the considerable prejudice to the government, outweighed the other factors.

We conclude that the trial court properly considered the *Phelps* factors and found that the Defendant did not provide sufficient justification of a fair and just reason for the withdrawal of his plea. The trial court did not abuse its discretion when it determined that the seventh factor outweighed all those that weighed in the Defendant's favor. As such, the trial court did not abuse its discretion by denying the Defendant's request to withdraw his guilty plea, and he is not entitled to relief.

### B. Sentencing

The Defendant next contends that the trial court erred when it ordered that his sentences run consecutively. The State responds that the trial court properly ordered the sentences to run consecutively after considering all the *Wilkerson* factors as required. We agree with the State.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a presumption of reasonableness." *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and

characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2019).

Where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the categories in Code section 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861.

When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705).

When the trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995). Trial courts must make specific findings regarding these two "*Wilkerson* factors" before imposing consecutive sentences. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court specifically addressed its consideration of the Defendant as a dangerous offender because he had physically abused the victim for multiple days to the point of near death and stated that he would treat his own children the same way. For this conduct, the Defendant showed little to no remorse and the trial court found that his treatment of the victim and lack of remorse made him dangerous to others.

As to whether an extended sentence was necessary to prevent the Defendant from further criminal conduct, the trial court specifically found:

> the [D]efendant would intend to do [to] another child the same way. He just really doesn't see what's wrong. I don't know what's going on in his mind to not see what's wrong, to sit here and claim to be the hero of the situation when he was the one that said, we need to pop her in the mouth, we need to hit her, an eight-month[-]old. . . . . The intention was that the child, at least preliminary, would be exchanged, each parent would have her a week at a time, and [the Defendant] would have been part of [the victim's] life when she was with her mother for the week at a time. ["]I'll break [the victim] from . . . crying, when we do a week at a time. I'll start lighting her ass on fire and every time she cries for no reason, I'll do it again.["] I agree that I don't think there's any evidence that [the Defendant] is an angry person. This wasn't done out of a fit of rage, this is just what [the Defendant] believed was appropriate on how to treat a child.

Finally, as to whether consecutive sentences reasonably related to the severity of the offenses committed, the trial court noted that it was fortunate that the victim had not died from her injuries, and it noted the continued suffering and medical needs the victim would require for her entire life. On that basis, the trial court found that consecutive sentences reasonably related to the seriousness of the Defendant's offenses. We agree. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing analysis and conclusions, we affirm the trial court's judgments.

_____s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, JUDGE

13